## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| IRIS SERRANO, | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:10-CV-468 (JCH) |
| | : | |
| v. | : | |
| | : | |
| MICHAEL J. ASTRUE, Commissioner | : | APRIL 12, 2011 |
| of the Social Security Administration, | : | |
| Defendant. | : | |

### RULING ON MOTIONS (Doc. Nos. 12 and 13)

This action, filed under section 205(g) of the Social Security Act, 42 U.S.C. §§

405(g) and 1383(c)(3), as amended, seeks review of a final decision by the

Commissioner the Social Security Administration denying plaintiff Disability Insurance

Benefits ("DIB") and Supplemental Security Income ("SSI") benefits. Plaintiff has filed a

Motion for Order Reversing the Decision of the Commissioner (Doc. No. 12). In

response, Defendant filed a Motion to Affirm the Decision of the Commissioner (Doc.

No. 13). For the following reasons, Plaintiff's Motion for Order Reversing the Decision

of the Commissioner (Doc. No. 12) is denied, and Defendant's Motion to Affirm the

Decision of the Commissioner (Doc. No. 13) is granted.

### I.    ADMINISTRATIVE PROCEEDINGS

On August 20, 2007, plaintiff Iris Serrano filed an application for DIB and SSI

alleging an inability to perform any substantial gainful activity since July 5, 2007 due to

depression, anxiety, and a heart murmur. R. at 156, 162, 181. On August 24, 2007,

plaintiff amended her application to reflect a disability onset date of June 5, 2007. Id. at

167-70. The Social Security Administration ("SSA") denied plaintiff's claim both initially

and upon reconsideration.  Id. at 67.  On August 18, 2008, plaintiff requested a hearing before an Administrative Law Judge ("ALJ") and on November 5, 2009, a hearing was held before ALJ James Thomas during which plaintiff and Vocational Expert Ronald Freedman testified.  Id. at 25-26.  On November 27, 2009, ALJ Thomas issued a decision denying plaintiff's claim.  Id. at 11-20.  Plaintiff's claim was selected for review by the Decision Review Board, but the Decision Review Board did not complete its review during the time allowed.  Therefore, ALJ Thomas' decision became the final decision of the Commissioner.  Id. at 1.

## II.    FACTUAL BACKGROUND

### A.    Summary of Facts

Plaintiff Iris Serrano was born in 1962 and was forty-seven years old when the ALJ issued the decision in this case.  R. at 20, 28.  She has a sixth or seventh grade education from Puerto Rico and lacks fluency in the English language.  Id. at 31, 186.  Plaintiff last worked as a machine operator.  Id. 32, 182.  She alleges disability due to degenerative disk disease and chronic pain, fibromyalgia, hypertension with a syncope incident, diabetes, depression, and anxiety.  See Pl.'s Mem. at 3.

### B.    Medical History

On May 21, 2007, plaintiff reported to the emergency room of Bristol Hospital complaining of pain in her right hip and chronic back pain.  R. at 369-71.  X-rays taken on the same day showed narrowing at the L5-S1 disk space.  Id. at 222.  On June 1, 2007, plaintiff reported to Dr. Arturo Baltazar that she was unable to work eight hours a day.  Id. at 593.  On June 6, 2007, after plaintiff complained of lower back pain, Dr. Baltazar wrote a note stating that plaintiff would be able to return to work on June 11,

2

2007, for five hours a day.  Id. at 591.  Later that month, plaintiff had an MRI that

showed moderate to advanced intervertebral disk degeneration at L5-S1.  Id. at 386.

On August 5, 2007, plaintiff fainted and reported to the Bristol Hospital

emergency room.  Id. at 287-300.  At the hospital, plaintiff received a cranial CT scan,

which was negative.  Id. at 300.  As follow-up care for her fainting spell, she received an

echocardiograph, a carotid ultrasound, and an EEG on August 16, 2007.  Id. at 353-55,

380-82.  All three tests had normal results.

Immediately after her fainting spell, plaintiff began seeing Dr. Karen Guadagnini

for her primary care.  Id. at 304-07.  During the fall and winter of 2007, Dr. Guadagnini

treated plaintiff for depression, high blood pressure, anemia, and back and arm pain.

Id. at 577-80.  On September 27, 2007, Dr. Guadagnini completed an impairment

questionnaire from the disability determination service ("DDS") regarding plaintiff.  Id. at

302-07.  Dr. Guadagnini reported that plaintiff was diagnosed with depression, which

she had had since age twenty, and had a suicide attempt two decades previously.  Id.

at 304.  Dr. Guadagnini indicated that plaintiff's orientation, memory, attention, and

concentration were intact, that her speech had a normal rate and flow, and that her

mood and affect were euthymic and appropriate.  Id. at 305.  Dr. Guadagnini also

reported that plaintiff's judgment and insight appeared to be fair and that she had no

problems in activities of daily living, in social interaction, in carrying out instructions, or

in focusing long enough to finish assigned simple tasks.  Id. at 305-06.  In her office

notes from the same day she completed the questionnaire, Dr. Guadagnini wrote that

she did not think plaintiff was disabled and that working might help her to feel better

emotionally.  Id. at 577.  Similarly, on December 19, 2007, Dr. Guadagnini's notes

indicate that she refused to sign a form for plaintiff to stay out of work for an additional six months.  Id. at 579.

In October 2007, two reviewing doctors completed reports on plaintiff for DDS. Id. at 320-42.  Plaintiff refused to attend appointments with the doctors because she "[did] not want to see a doctor that does not know her;" therefore, the doctors completed the reports by reviewing plaintiff's medical records.  Id. at 320, 333.  The first report was completed by Dr. Anita Bennett, who reviewed plaintiff's physical impairments and reported that there was no medical evidence to support plaintiff's claimed limitations.  Id. at 320.  The second report, by Gregory Hanson, Ph.D. on October 10, 2007, analyzed plaintiff's mental impairments.  Id. at 321.  Dr. Hanson evaluated plaintiff's affective disorder and anxiety-related disorder and concluded that they were not severe.  Id.  He reported that plaintiff's depressive syndrome was characterized by sleep disturbance, decreased energy, difficulty concentrating or thinking, and thoughts of suicide, id. at 324, and that her anxiety was accompanied by apprehensive expectation, id. at 326, but that these symptoms caused only mild restriction in activities of daily living and mild difficulties in maintaining social functioning and in maintaining concentration, persistence and pace, id. at 331.

Also in October 2007, plaintiff was seen at the Bristol Hospital Counseling Center for complaints of anxiety and depression.  Id. at 399-403.  At her initial appointment, plaintiff reported weight loss and difficulty sleeping and admitted to having auditory hallucinations.  She denied suicidal ideation and said that, although she had been on Prozac for many years to treat her depression, she was non-compliant with her medication.  Id. at 400, 402.  Plaintiff was diagnosed with Major Depressive Disorder,

4

and Personality Disorder (NOS) and given a Global Assessment Functioning ("GAF") rating of forty-five. Id. at 403. Outpatient group therapy was recommended. Id. Plaintiff attended one group session on November 14, 2007, where it was reported that she was calm and compliant with treatment, but plaintiff failed to show up for any further counseling sessions. Id. at 405-07.

On May 1, 2008, plaintiff went to Bristol Hospital after a dentist appointment. Id. at 506. She asked to make a complaint with the police because she was concerned that she had been sexually assaulted while under the influence of laughing gas administered by the dentist. Id. at 506-09. The police were called to interview plaintiff. Id. at 509. She was ultimately discharged upon determination that the medication she received at the dentist had caused her to be confused. Id. at 509-11.

During the spring of 2008, Dr. Guadagnini reported that plaintiff was not taking the medication prescribed for her depression. Id. at 582. Because plaintiff continued to experience pain in her shoulder, thigh, knee, and lower back, Dr. Guadagnini prescribed plaintiff Celebrex, a nonsteroidal anti-inflammatory, and referred plaintiff to a rheumatologist. Id. at 581. Dr. Guadagnini also referred plaintiff to the Bristol Hospital Center for Diabetes on June 27, 2008, for medical nutrition therapy and health education related to her diagnosis of type 2 diabetes. Id. at 441-62.

Rheumatologist Dr. Micha Abeles examined plaintiff on July 16, 2008. Id. at 545-47. Dr. Abeles reported that plaintiff had tender points in her shoulders, upper back, upper extremities, and her forearm and that she had "pain to palpitation in the lateral aspect of her thighs bilaterally more significant on the right than on the left as well as tender spots in her knees and anterior tibial regions." Id. at 546. He also

reported that her range of motion was normal for her upper and lower extremity joints, that her hands revealed no evidence of chronic arthritis or synovitis, that her neurologic exam was intact, and that she had 5/5 strength in all extremities. Id. Dr. Abeles concluded that plaintiff's symptoms were consistent with fibromyalgia but did not recommend any further treatment except for a continuation of fluoxetine. Id.

On August 28, 2008, plaintiff received an MRI of her lumbar spine. Id. at 539. The MRI revealed degenerative disk disease "with bulge annuli and marginal spurring at L5-S1 and L3-4." Id. However, it showed no focal discrete disk herniations and no evidence of spinal stenosis. Id. On April 20, 2009, plaintiff received an MRI of her right shoulder. Id. at 551. The MRI revealed superficial tendonitis, but no rotator cuff tear. Id.

Dr. Hilary Onyiuke of UConn Medical Group Neurosurgery Associates examined plaintiff on July 10, 2009. Id. at 558-59. Plaintiff complained of a one-year history of low back pain with radiation down the right leg but not the left. Id. at 558. After an examination, Dr. Onyiuke noted that she had no focal motor deficiencies. Id. He reviewed the MRI of plaintiff's lumbar spine and concluded that plaintiff has lumbar degenerative disk disease with disk collapse L5-S1 with lateral recess stenosis on the right side. Id. Dr. Onyiuke opined that plaintiff would eventually require operative intervention, but that she would currently benefit from conservative treatment, including physical and aquatic therapy and lumbar epidural steroid injection. Id.

Upon the request of plaintiff in July 2009, id. at 553, Dr. Guadagnini wrote a letter in which she reported that plaintiff suffers from multiple herniated disks in her lower spine, degenerative disk disease, and chronic pain. Id. at 556. She opined that

plaintiff "is unable to work at this time," and reported that plaintiff "will be under going surgical procedures in a few months which will further prolong her inability to work." Id.

During the spring and summer of 2009, plaintiff was also receiving psychiatric care. On March 9, 2009, plaintiff returned to Bristol Hospital Counseling Center. Id. at 422-27. At her initial assessment, it was noted that plaintiff had an appropriate affect, intact memory, and fluid speech, but that her mood was depressed and she had hallucinations. Id. at 425. She was diagnosed with Panic Disorder with Agoraphobia and Depressive Disorder (NOS) and was given a GAF rating of forty. Id. at 427. It was recommended that plaintiff receive short-term individual therapy. Id. at 426.

Plaintiff attended therapy from March 18 through July 23, 2009 with Dr. Diedre Reynolds. Id. at 415-21. At her first visit, Dr. Reynolds increased plaintiff's prescription for Prozac and started her on a trial dosage of Seroquel. Id. at 413. At her next visit on April 2, 2009, plaintiff reported that she felt better and was sleeping eight hours a night. Id. at 418. In May, she had no complaints and reported that her energy was up and her mood was good. Id. On June 24, plaintiff reported that she was having sleep problems related to pain in her shoulders and neck, and that her depression had increased. Id. at 417. In response to plaintiff's complaints, Dr. Reynolds increased the dosage on plaintiff's prescription for Seroquel. Id. at 413, 417. At her next appointment on July 23, 2009, plaintiff reported that she no longer felt depressed and that her pain had decreased. Id. at 417. On September 17, 2009, plaintiff left without seeing Dr. Reynolds, and on September 23, she was late and was not seen. Id. at 413, 416. On September 30, Dr. Reynolds noted that plaintiff had been absent from therapy and that the case may be closed. Id. at 415.

7

On September 11, 2009, plaintiff got a cane.  Id. at 408.  The need for the cane was not specified in the record.

C.    ALJ's Disability Determination

The Social Security Act provides that every individual who suffers from a disability is entitled to disability insurance benefits.  See 42 U.S.C. § 423(a)(1).  A disability is defined as, "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." Id. § 423(d)(1)(A).  The impairment or impairments must be of such severity that the claimant:

> is not only unable to do his previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

Id. § 423(d)(2)(A).

Under the Act, the Social Security Administration ("SSA") has established a five-step, sequential evaluation process for determining whether an individual is disabled.  See 20 C.F.R. § 416.920(a).  The steps are followed in order.  If at any step it can be determined that the claimant is or is not disabled, that determination is made and the evaluation ends without proceeding to the next step.

At step one, the Commissioner must determine whether the claimant is engaged in substantial gainful activity.  See id. § 416.920(b).  Generally, if an individual has earnings from employment or self-employment above a level set out in the regulations,

it is presumed that that individual has demonstrated the ability to engage in substantial gainful activity. See id. §§ 416.974-.975. If the claimant is not engaged in substantial gainful activity, the evaluation proceeds to step two.

At step two, the Commissioner must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe." See id. § 416.920(c). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. If the claimant has an impairment or combination of impairments that is "severe," the evaluation proceeds to step three.

At step three, the Commissioner must determine whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in the appendix to the regulations. See id. §§ 416.920(d), .925-.926. If the claimant's impairment or combination of impairments meets or medically equals the criteria of a listing, and meets a duration requirement, the claimant is disabled. If not, the evaluation proceeds to step four.

At step four, the Commissioner must determine the claimant's residual functioning capacity ("RFC") and then determine whether the claimant has the RFC to perform the requirements of the claimant's past relevant work. See id. § 416.920(e)-(f). If the claimant has the RFC to perform past relevant work, the claimant is not disabled. If the claimant is unable to perform any past relevant work, the evaluation proceeds to the fifth and last step.

At step five, the Commissioner must determine whether the claimant is able to perform any other work, taking into consideration the claimant's RFC, age, education,

and work experience.  See id. § 416.920(g).  If the claimant is not able to perform other work and meets the duration requirement, the claimant is disabled.

The burden of establishing a disability is on the claimant. Once the claimant meets the burden for the first four steps of the disability evaluation, however, the burden then shifts to the Commissioner for the fifth step.  See Balsamo v. Chater, 142 F.3d 75, 80 (2d Cir. 1998).

In the present case, the ALJ found that plaintiff satisfied the first step of the disability determination because she had not engaged in substantial gainful activity since June 5, 2007, the alleged onset date. R. at 14.  The ALJ also found that Plaintiff satisfied the second step because her degenerative disk disease and fibromyalgia are severe impairments.  Id.

At the third step, the ALJ then found that plaintiff's impairments do not meet or medically equal one of the listed impairments in the appendix to the regulations.  Id. First, he found that plaintiff's degenerative disk disease do not "meet[], or medically equal[], the requirements of any section of the Musculoskeletal System listed in Appendix 1, Subpart P, Regulation No. 4, e.g., section 1.04."  Id.  Next, he found that plaintiff's mental impairments do not meet or medically equal the criteria of Listings 12.04 and 12.06.  Id.  To make that determination, the ALJ considered the "paragraph B" criteria of the two listings—marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation—and found that plaintiff did not meet them.  Id. at 14-15.  In support of the finding that plaintiff's impairments were mild, the ALJ noted plaintiff's daily activities, Dr.

Guadagnini's opinion regarding plaintiff's functional abilities, and the lack of evidence suggestive of periods of decompensation.  Id. at 15.

At step four, the ALJ made a finding on plaintiff's RFC and determined that plaintiff was able to perform her past relevant work as a machine operator.  Id. at 15-19. The ALJ found that plaintiff "has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), except that she could only occasionally climb ramps and stairs, and is precluded from climbing ropes, ladders and scaffolds.  Additionally, she could only occasionally balance, stoop, kneel, crouch or crawl."  Id. at 15.

To determine plaintiff's RFC, the ALJ conducted a review of her testimony, the medical record, and the testimony of the vocational expert.  First, he noted plaintiff's education and work history and summarized plaintiff's complaints regarding her symptoms and impairments.  From plaintiff's testimony, the ALJ highlighted plaintiff's statements that she could lift and carry a gallon of milk, walk for half a mile without pain, and that she has pain with sitting for prolonged periods.  Id. at 16-17.  After reviewing her testimony, the ALJ found plaintiff's complaints of back pain and right leg pain partially credible in light of her degenerative disk disease and history of low back pain. Id. at 17.

The ALJ then reviewed plaintiff's medical record.  He summarized the reports from Drs. Abeles and Onyiuke and noted that he gave Dr. Onyiuke's opinion significant weight.  Id.  The ALJ considered the report from Dr. Baltazar, but gave it little weight because the work restrictions from Dr. Baltazar were not permanent, no medical reasons were given for the restricted work schedule, and the restrictions were not

supported by the overall evidence on record.  Id.  Next, the ALJ found that there was no evidence that plaintiff's diabetes and hypertension caused her any more than minimal work-related limitations.  Id. at 17-18.

The ALJ also considered the medical record and plaintiff's testimony regarding her mental impairments.  He gave a detailed summary of Dr. Reynold's notes regarding plaintiff's improvement in mood throughout the course of her treatment, but gave little weight to the global assessment of functioning score Dr. Reynold's assigned to plaintiff because it was "not supported by the overall evidence of record."  Id. at 18.  The ALJ did give significant weight to Dr. Guadagnini's opinion that, "while the claimant was diagnosed with depression, she had experienced a slight improvement with treatment, and her cognitive status was intact" and that the claimant has "no problems in terms of activities of daily living, social functioning and task performance."  Id.

After determining plaintiff's RFC, the ALJ found that she was able to perform her past relevant work as a machine operator as the job was actually performed and as it is generally performed in the national economy.  Id. at 19.  To make that determination, the ALJ credited the opinion of the vocational expert who testified that a hypothetical individual with plaintiff's RFC could perform plaintiff's past relevant work as a machine operator.  Id.

Because he found that plaintiff could perform her past relevant work, the ALJ determined that plaintiff was not disabled.  Id.

## III.     STANDARD OF REVIEW

The scope of review of a social security disability determination involves two levels of inquiry.  The court must first decide whether the Commissioner applied the

correct legal principles in making the determination.  Then, the court must decide

whether the determination is supported by substantial evidence.  Balsamo,142 F.3d at

79.  Substantial evidence is evidence that a reasonable mind would accept as adequate

to support a conclusion; it is more than a "mere scintilla."  Richardson v. Perales, 402

U.S. 389, 401 (1971); Yancey v. Apfel, 145 F.3d 106, 110 (2d Cir. 1998).  The

substantial evidence rule also applies to inferences and conclusions that are drawn

from findings of fact.  Gonzales v. Apfel, 23 F. Supp. 2d 179, 189 (D. Conn. 1998);

Rodrigues v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977).  The court may not

decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.

Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993).  Instead, the court must scrutinize

the entire record to determine the reasonableness of the ALJ's factual findings.  See id.

Furthermore, the Commissioner's findings are conclusive if supported by substantial

evidence and should be upheld even in those cases where the reviewing court might

have found otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d

1432, 1433 (2d Cir. 1997) (citation omitted).

## IV.    ANALYSIS

Plaintiff argues that the ALJ made the following errors: (1) the ALJ applied the

wrong legal standard at step three of the disability determination analysis; (2) the ALJ's

decision is not supported by the record; (3) the ALJ violated the treating physician rule;

and (4) the ALJ failed to reconcile inconsistencies between the Dictionary of Vocational

Titles and the vocational expert's testimony.

### A.    Disability Listings

Review of this case begins at the third step of the sequential evaluation process.

Plaintiff argues that the ALJ erred in finding that she did not meet or equal Listing 1.04C in Appendix 1 of Subpart P of Part 404, 20 C.F.R., based on her diagnoses of degenerative disk disease and fibromyalgia.  ALJ Thomas rejected this contention, stating: "I considered whether the claimant's degenerative disk disease meets, or medically equals, the requirements of any section of the Musculoskeletal System listed in Appendix 1, Subpart P, of Regulation No. 4, e.g., section 1.04.  I ultimately decided that the requirements of section 1.04, or any other section, are not met or medically equaled."  R. at 14.  Unfortunately, the ALJ failed to set forth a specific rationale in support of the foregoing conclusion.  Nonetheless, the absence of an express rationale does not prevent the court from upholding the ALJ's determination regarding plaintiff's claimed listed impairment if his conclusion was supported by substantial evidence.  See Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982).

To meet listing 1.04C, a claimant must have "lumbar spinal stenosis resulting in pseudoclaudication . . . and resulting in an inability to ambulate effectively."  20 C.F.R. Part 404, Subpart P, Appendix 1, Part A, § 1.04(C).  Ineffective ambulation is defined as "having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities."  Id. at 1.00(B)(2)(b) (emphasis added).  The use of a cane does not meet the regulation's definition of an inability to ambulate ineffectively because the use of a cane impacts the functioning of one hand/arm only.  As plaintiff claims to need only a cane to ambulate effectively, the ALJ's determination that the plaintiff does not meet the requirements of listing 1.04C is supported by substantial evidence.

Plaintiff also claims that the ALJ erred in his conclusion that she does not meet

the listings for 12.04, Affective Disorders, and 12.06, Anxiety-Related Disorders.

Plaintiff argues that ALJ Thomas' finding that her mental impairments are not severe is

not supported by substantial evidence and that the record supports a finding of

disability based on her mental impairments.

Under the Social Security Administration's regulations, in order to make a

determination about a claimant's mental impairment, an ALJ must rate the claimant's

degree of functional limitation in the following categories: 1) activities of daily living; 2)

social functioning; 3) concentration, persistence, or pace; and 4) episodes of

decompensation. 20 C.F.R. §§ 404.1520a(c)(3), (e)(2). ALJs are to rate those

functions as one of the following degrees: none, mild, moderate, marked, and extreme

(for activities of daily living; social functioning; and concentration, persistence, or pace)

and none, one or two, three, four, or more (for episodes of decompensation). Id. §

404.1520a(c)(4). "According to the regulations, if the degree of limitation in each of the

first three areas is rated 'mild' or better, and no episodes of decompensation are

identified, then the reviewing authority generally will conclude that the claimant's mental

impairment is not 'severe' and will deny benefits." Kohler v. Astrue, 546 F.3d 260, 266

(2d Cir. 2008) (citing 20 C.F.R. § 404.1520a(d)(1)).

Even if a claimant's functional limitations rise above mild in a particular category,

the claimant will not necessarily meet the requirements of a mental disorder disability

listing. To meet or medically equal the "paragraph B" criteria for listings 12.04 and

12.06 requires at least two of the following: a marked restriction of activities of daily

living; marked difficulties in maintaining social functioning; marked difficulties in

maintaining concentration, persistence, or pace; or repeated episodes of

decompensation, each of extended duration.  See 20 C.F.R. Subpart P, Appendix 1,

Part A, §§ 12.04(B), 12.06(B).  The regulations defined "marked" to mean more than

moderate but less than extreme.  See id. § 12.00(C).  Episodes of decompensation are

defined as "exacerbations or temporary increases in symptoms or signs accompanied

by a loss of adaptive functioning . . . [and] may be inferred from medical records

showing significant alteration in medications; documentation of the need for a more

structured psychological support system (e.g., hospitalizations, placement in a halfway

house, or a highly structured and directing household); or other relevant information in

the record about the existence, severity, and duration of the episode."  Id. §

12.00(C)(4).

Here, ALJ Thomas rated plaintiff's functioning in each of the four categories.  He

found that she had mild impairments in performing activities of daily living, in social

functioning, and with concentration, persistence and pace.  He also found that she had

not experienced any episodes of decompensation during the relevant time period.

Because he found that plaintiff's impairments in these categories were mild and that

she had experienced no episodes of decompensation, ALJ Thomas concluded that

plaintiff's mental impairments were not severe and she did not meet or medically equal

the listed impairments in 20 CFR Part 404, Subpart P, of Appendix 1.

The ALJ's conclusion that plaintiff's mental impairments produced only mild

functional limitations is supported by substantial evidence, which he highlighted in his

opinion.  First, ALJ Thomas noted plaintiff's daily activities, such as caring for her dog,

visiting with friends, and doing things around the house.  R. at 15 .  Next, ALJ Thomas

discussed the opinion of plaintiff's treating physician, Dr. Guadagnini.  Id. at 15.  In a

September 27, 2007 disability report, Dr. Guadagnini noted that while plaintiff was depressed, it did not affect her general appearance, her cognitive status was intact, her thought contact was normal, her mood was appropriate, and her judgment and insight appeared to be fair. Id. at 304-05. Dr. Guadagnini reported that plaintiff had no problem with activities of daily living, social interactions, or task performance. Id. at 305-06.

Plaintiff argues that this report should be given little weight because Dr. Guadagnini completed the report when plaintiff had only been her patient for a month and that Dr. Guadagnini's opinion changed over the course of development of the doctor-patient relationship. Plaintiff's argument, however, is not supported by the record. Plaintiff's medical records indicate that on December 19, 2007, Dr. Guadagnini declined to sign a form for plaintiff to remain out of work for an additional six months, id. at 579, and in a July 31, 2009 letter, which listed the medical conditions that impaired Plaintiff's ability to work, Dr. Guadagnini did not mention plaintiff's mental condition as an impairment, id. at 556.

Finally, ALJ Thomas found that plaintiff has not experienced any episodes of decompensation. Id. at 15. This conclusion is supported by the medical records from Dr. Reynolds, which show that plaintiff's medication regimen to treat her depression and anxiety remained relatively stable throughout the course of her treatment and note that, overall, plaintiff seemed to respond well to her treatment. Id. at 413-21. At all but one of her appointments after beginning treatment with Dr. Reynolds, plaintiff indicated that she "feels better" and was "no longer depressed." Id. at 417-18.

The court, therefore, concludes that the ALJ applied the correct legal standard to

step three of the disability determination analysis and that his finding that plaintiff's impairments do not meet Listings 1.04, 12.04, and 12.06, is supported by substantial evidence.

B.     The ALJ's Evaluation of the Medical Opinions

The treating physician rule is well established in the Second Circuit. "SSA regulations advise claimants that, 'a treating source's opinion on the issue(s) of the nature and severity of your impairment(s)' will be given 'controlling weight' if the opinion is 'well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record.'" Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003) (quoting 20 C.F.R. § 404.1527(d)(2)).  The rationale underlying the treating physician rule is that more weight should be given to opinions from treating sources because those sources are more likely to have detailed knowledge and understanding of the claimant's medical impairment.  Arnone v. Bowen, 882 F.2d 34, 41 (2d Cir. 1989).  If the treating physician's opinion is not given controlling weight, the Second Circuit has set forth several factors to determine what weight it should be given, including (1) the frequency of examination and the length, nature and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; and (4) whether the opinion is from a specialist.  Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

Plaintiff alleges the ALJ violated the treating physician rule by "splic[ing] portions of the records of Drs. Guadagnini, Abeles and Reynolds, rejecting those portions that would have supported a favorable decision or at a minimum required a more in depth

discussion" and by failing to conduct the analysis required to refute the treating source presumption. See Pl.'s Mem. at 22. A review of ALJ Thomas' opinion, however, demonstrates that he gave significant weight to the opinions of plaintiff's treating physicians. The only opinions to which ALJ Thomas did not fully defer were those of Drs. Baltazar, Reynolds, and Guadgnini.

As to Drs. Guadagnini and Baltazar, the court finds that the ALJ did not err in failing to afford controlling weight to Dr. Guadagnini's opinion that plaintiff is unable to work "at this time" and to Dr. Baltazar's opinion that plaintiff should only work five hours per day because neither doctor provided a functional basis for his/her opinion nor stated whether he/she thought plaintiff's ability to work was permanently or merely temporarily impaired. R. at 556, 591. Moreover, despite the great weight given to the opinion of a treating physician, a statement by a treating physician that a claimant is "disabled" or "unable to work" does not mean that the Commissioner must determine that the claimant is disabled. 20 C.F.R. § 404.1527(e); see Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000). The Regulations specifically provide that the determination of whether a claimant is disabled is a determination to be made by the Commissioner. 20 C.F.R. § 404.1527(e); see Jordan v. Barnhart, 29 F. App'x 790, 793-94 (2d Cir. 2002); Bond v. Soc. Sec. Admin., 20 F. App'x 20, 21 (2d Cir. 2001); Parker v. Callahan, 31 F. Supp. 2d 74, 77 (D. Conn. 1998). No deference is owed to a physician's statement that a claimant is "disabled," because that determination is a legal conclusion, not a medical determination, reserved for the ALJ, the Commissioner, and the courts. See Michels v. Astrue, 297 Fed. App'x 74, 75 (2d Cir. 2008); Green-Younger, 335 F.3d at 106.

With regard to Dr. Reynolds, the ALJ frequently referred to her reports from

plaintiff's office visits but gave little weight to the global assessment of functioning (GAF) score that Dr. Reynolds assigned to plaintiff during her initial consultation on March 9, 2009. ALJ Thomas stated, "[w]hile the claimant was assigned a global assessment of functioning (GAF) score of 45, I find that this poor level of functioning is not supported by the overall evidence of record, and the opinion, in that regard, is given little weight." R. at 18. This court concludes that, because the GAF score assigned by Dr. Reynolds is inconsistent with Dr. Guadagnini's opinion, id. at 18, and did not reflect the improvement in plaintiff's mood that Dr. Reynolds observed over the course of treating the plaintiff, id. at 417-19, ALJ Thomas did not err in giving little weight to the GAF score.

C.    Determination of Residual Functional Capacity

Plaintiff's next assignment of error is that the ALJ did not properly determine her residual functional capacity ("RFC"). She claims that the ALJ did not address her mental limitations and that he made no allowance for her diabetes, hypertension, or the effects of her chronic pain.

Social Security Ruling 96-8p provides that the RFC assessment must include a discussion of the individual's maximum, remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis and must be based on all relevant evidence in the record. 1996 WL 374184, at *2 (S.S.A. July 2, 1996). In assessing an individual's exertional capacity, the Ruling states that each function— sitting, standing, walking, lifting, carrying, pushing and pulling—must be considered separately. Id. The RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g.,

laboratory findings) and nonmedical evidence (e.g., daily activities, observations) . . . and must describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." Id.

Here, the ALJ determined that plaintiff could perform light work, as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that she could only occasionally climb ramps and stairs, is precluded from climbing ropes, ladders, and scaffold, and can only occasionally balance, stoop, kneel, crouch, or crawl. R. at 15. Although plaintiff claims that the ALJ failed to give allowances for the effects of chronic pain in establishing her RFC, ALJ Thomas' analysis at step four of the disability determination analysis shows that he did consider plaintiff's pain in determining her RFC. ALJ Thomas accepted Dr. Abeles' opinion that plaintiff had fibromyalgia and that this condition caused her pain. Id. at 17. He also gave significant weight to Dr. Onyiuke's report addressing plaintiff's back pain. Id. While ALJ Thomas did not find plaintiff's statements regarding the intensity, persistence and limiting effects of her symptoms to be wholly credible based on her daily activities and medical record, id. at 18, he did find her complaints of back pain and right leg pain partially credible in light of her degenerative disc disease and adjusted her RFC accordingly, id. at 17.

Contrary to plaintiff's allegation, ALJ Thomas also addressed plaintiff's mental health diagnosis, diabetes, and hypertension in his assessment of her RFC. ALJ Thomas acknowledged that plaintiff testified to having dizzy spells and had a history of syncope, but he found that the episodes were infrequent and caused plaintiff no more than minimal work-related limitations. Id. at 18. ALJ Thomas also discussed plaintiff's depression and anxiety. As discussed previously, ALJ Thomas found plaintiff's mental

impairments to be non-severe, and he relied on Dr. Guadagnini's opinion regarding plaintiff's functional abilities and plaintiff's self-reported daily activities to find that her mental impairments did not result in significant limitations.  Id.

    D.    <u>Plaintiff's Ability to Perform Past Relevant Work</u>

    At step four of the disability determination analysis, the ALJ must determine whether the claimant has the RFC to perform the requirements of the claimant's past relevant work.  <u>See</u> 20 C.F.R. § 416.920(e)-(f).  To support a finding of disability, the claimant must have a medically determinable physical or mental impairment of such severity that she is unable to do her previous work.  "A claimant will be found to be "not disabled" when it is determined that he or she retains the RFC to perform: (1) the actual functional demands and job duties of a particular past relevant job; or (2) the functional demands and job duties of the occupation as generally required by employers throughout the national economy."  SSR 82-61 (citing 20 C.F.R. §§ 404.1520(e), 416.920(e)).

    Here, ALJ Thomas found that plaintiff was capable of performing her past relevant work as a machine operator, as the job was actually performed and as it is generally performed in the national economy.  R. at 19.  To reach this finding, ALJ Thomas relied on Vocational Expert Ronald Freedman's testimony that plaintiff's past relevant work was unskilled and only required light exertional capabilities, and Freedman's opinion that a person with plaintiff's RFC could perform plaintiff's past relevant work as a machine operator.  Id. at 55-57.

    Plaintiff claims that ALJ Thomas reached this finding in error.  She argues that ALJ Thomas is expressly precluded from relying on Freedman's testimony because it

deviates from the exertional levels outlined in the "Dictionary of Occupational Titles" ("DOT"), which classifies a machine operator as medium level work as it is performed in the national economy. Pl.'s Mem. at 15. Plaintiff also argues that ALJ Thomas misrepresented Freedman's testimony in his decision when he stated that "the vocational expert's testimony is consistent with the information in the Dictionary of Occupational Titles." R. at 19.

Plaintiff is correct that ALJ Thomas failed to acknowledge the conflict between the testimony of the vocational expert and the DOT, but he did not err in his reliance on the vocational expert's testimony over the DOT. As discussed previously, the claimant has the burden to show an inability to return to her previous specific job and an inability to perform her past relevant work generally. See SSR 82-62. This inquiry requires separate evaluations of a previous specific job and the job as it is generally performed.

> Whereas the [DOT] describes jobs as they are generally performed, an expert is often called upon to explain the requirements of particular jobs, and as such, his deviations from the [DOT] in such testimony do not actually 'conflict' with the [DOT]. Many specific jobs differ from those jobs as they are generally performed, and the expert may identify those unique aspects without contradicting the DOT.

Jasinski v. Barnhart, 341 F.3d 182, 185 (2d Cir. 2003).

At the hearing, Vocational Expert Freedman testified that, although a machine operator would normally be at the medium exertional level, as the plaintiff performed the job it was better classified as sedentary. R. at 55. Because Freedman distinguished between the requirements of the job as it is generally performed and the requirements as it was actually performed by plaintiff, his deviation from the DOT did not conflict with the DOT.

There is substantial evidence to support the ALJ's finding that plaintiff's work as a machine operator as she performed it did not require the performance of tasks that exceeded her RFC.  Along with Vocational Expert Freedman's testimony, plaintiff admits in her Memorandum of Law that the job of machine operator as she performed it was at a sedentary exertional level.  Pl.'s Mem. at 20.  Since plaintiff has the RFC to perform her past work as a machine operator as she actually performed it, ALJ Thomas correctly found that she is not disabled under the regulations.

**V.     CONCLUSION**

After examining the administrative record, the court concludes that substantial evidence supports the ALJ's decision, including the objective medical evidence and medical opinions.  The ALJ thoroughly examined the record and afforded appropriate weight to the medical evidence when rendering his decision that plaintiff is not disabled. Because the court finds that substantial evidence supports the ALJ's decision, Plaintiff's Motion for an Order Reversing the Decision of the Commissioner (Doc. No. 12) is denied, and Defendant's Motion to Affirm the Decision of the Commissioner is (Doc. No. 13) is granted.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 12th day of April, 2011.

 /s/ Janet C. Hall
Janet C. Hall
United States District Judge